SPROUL REALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90563. Filed September 13, 1962.

*Fred L. Rosenbloom, Esq.*, for the petitioner.
*Edward L. Newberger, Esq.*, for the respondent.

OPINION.

Raum, *Judge:* Under section 337(a) of the 1954 Code, a corporation which adopts a plan of complete liquidation and distributes all of its assets within a 12-month period thereafter recognizes no gain or loss from the sale or exchange of its property during such 12-month

liquidating period.[2]  However, section 337(c)(1)(A) states that these provisions shall not apply to any sale or exchange "made by a collapsible corporation (as defined in section 341(b))."  Pertinent excerpts from section 341(b) appear in the margin.[3]  At issue herein is the correctness of the Commissioner's determination that petitioner is a collapsible corporation and is, therefore, taxable on the gain it realized in 1957 from the sale of its chief asset, a shopping center, pursuant to a plan of liquidation.  If petitioner is held to be a collapsible corporation, a second issue is whether the gain which is then recognizable on the sale of the shopping center is taxable as ordinary income, as determined by the Commissioner, or as long-term capital gain, as claimed by the petitioner.

1. As set forth more fully in our findings, petitioner was formed in 1954 for the principal purpose of developing and constructing a shopping center in Springfield Township, Delaware County, Pennsylvania.  Between the time of its organization and the spring of 1956, petitioner purchased a 14½-acre tract of land for the shopping center, succeeded in having the zoning changed on such land from residential to commercial, hired an architect to prepare plans for the center, began negotiations with the Township with respect to

---

[2] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

[3] SEC. 341. COLLAPSIBLE CORPORATIONS.

(b) DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

(A) it is engaged in the manufacture, construction, or production of such property to any extent,

(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

(C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation.

(3) SECTION 341 ASSETS.— * * *

(4) UNREALIZED RECEIVABLES.— * * *

building permits and performance and maintenance bonds, obtained two tenants for the shopping center and was in the process of negotiating with a third, and had unsuccessfully attempted to obtain permanent mortgage financing for the necessary construction and improvements. Without more such preliminary activities on the part of a corporation have been held to constitute "construction" within the definition of a collapsible corporation. *J. D. Abbott*, 28 T.C. 795, 805, affirmed 258 F. 2d 537 (C.A. 3) ; *Leland D. Payne*, 30 T.C. 1044, 1058–1059, affirmed 268 F. 2d 617 (C.A. 5) ; *Ellsworth J. Sterner*, 32 T.C. 1144, 1149 ; *Jack Farber*, 36 T.C. 1142, 1156, on appeal (C.A. 2). Before the actual physical construction of the shopping center had begun and prior to the realization by petitioner of any income from the project, in September, 1956, petitioner agreed to sell the entire shopping center to the Knights of Columbus under a sales agreement that provided petitioner would assume the responsibility for the construction of the buildings and other improvements and the Knights of Columbus would reimburse petitioner for the costs of such construction and improvements up to a stipulated maximum amount. That sales agreement was entered into only after petitioner had exhausted all efforts to obtain mortgage financing to complete the project on its own behalf; it had not previously considered a sale and undertook to sell the shopping center only as a last resort when it became apparent that it would not be able to construct the project for itself. Petitioner agreed to accept $390,000 as consideration for the shopping center site, and petitioner's shareholders decided upon approving the sales agreement to adopt a plan of complete liquidation. Following completion of the physical construction of the shopping center in September of 1957, petitioner was paid in full for its interest therein, and thereafter petitioner proceeded to distribute its assets to its shareholders in liquidation.

Does petitioner in these circumstances come within the statutory definition of a collapsible corporation? In accordance with the regulations [4] issued under section 337 of the 1954 Code, this question must be decided on the basis of what would have happened if petitioner had liquidated the corporation by distributing its interest in the shopping center directly to its shareholders instead of selling that interest to the Knights of Columbus and distributing the resulting cash to its shareholders thereafter. The regulations provide that if petitioner would have been collapsible had it distributed its property in kind

---

[4] Sec. 1.337–1, Income Tax Regs.: "* * * Sales or exchanges made by a collapsible corporation (as defined in section 341(b)) are excluded from the operation of section 337 by section 337(c). Accordingly, section 337 does not apply to any sale or exchange of property whenever the distribution of such property in partial or complete liquidation to the shareholders in lieu of such sale or exchange would have resulted in the taxation of the gain from such distribution in the manner provided in section 341(a) as to any shareholder or would have resulted in the taxation of the gain in such manner, but for the application of section 341(d)."

to its shareholders, then it remains collapsible for purposes of applying the provisions of section 337 when it sells or exchanges its property pursuant to a plan of liquidation. We think that insofar as they are pertinent herein, the regulations represent a reasonable and proper interpretation of what Congress intended when it excepted collapsible corporations from the operation of the nonrecognition provisions of section 337.[5]

Upon consideration of the facts in accordance with the cited regulations, we conclude that petitioner comes within the definition of a collapsible corporation. We have already indicated that we think petitioner was availed of principally for the construction of property as the term "construction" is used in the statutory definition. And we think the requisite "view" was also present. If petitioner had distributed its entire interest in the shopping center to its shareholders and then the shareholders had sold the project to the Knights of Columbus, there would have occurred both a distribution to petitioner's shareholders before the realization by petitioner of a substantial part of the taxable income to be derived from the shopping center and the realization by petitioner's shareholders of gain attributable to the shopping center. Thereby, the two essential elements of the statutory "view" would have been filled. Because petitioner would have come squarely within the definition of a collapsible corporation if it had liquidated immediately prior to the sale of the shopping center rather than immediately after, we hold pursuant to the applicable regulations that petitioner must be considered a collapsible corporation for purposes of the exception contained in section 337(c), and that, therefore, it is not entitled to nonrecognition of its gain on the sale of the shopping center under section 337(a).

Petitioner's principal contention in opposition to being classified as a collapsible corporation is that its shareholders did not use the corporate form to convert ordinary income into capital gain, that the sale of the shopping center would have resulted in capital gain to its shareholders even if the corporate entity had not been used, and that the statute was never intended to include such a transaction within the definition of a collapsible corporation, citing *United States v. Ivey*, 294 F. 2d 799 (C.A. 5), rehearing denied 303 F. 2d 109, and *Honaker, Drlg., Inc. v. Koehler*, 190 F. Supp. 287 (D. Kans.). A similar argument was recently rejected in *Braunstein v. Commis-*

---

[5] Without the approach taken by the regulations or one comparable thereto, the exception for collapsible corporations in section 337(c) would have little or no meaning. Since any sale or exchange made pursuant to section 337 results in the corporation realizing (but not recognizing) income on its property prior to a distribution to its shareholders, no corporation liquidating under section 337 could ever come within that portion of the collapsible corporation definition requiring a sale or exchange of stock or a distribution to shareholders *before* the realization by the corporation of a substantial part of the taxable income to be derived from the property. Cf. DeWind & Anthoine, "Collapsible Corporations," 56 Col. L. Rev. 475, 523–526 (1956); MacLean. "Taxation of Sales of Corporate Assets in the Course of Liquidation," 56 Col. L. Rev. 641, 666–668 (1956).

*sioner*, 305 F. 2d 949 (C.A. 2), affirming 36 T.C. 22, on the basis that the statute contains no such limitation on the applicability of the collapsible corporation provisions, that the pertinent legislative history indicates that these provisions were intended to apply to some cases in which the property if sold by the shareholders would have produced capital gain, and, finally, that the addition of subsection (e) to section 341 by amendment in 1958 [6] would have been unnecessary if the limitation on the applicability of the statute urged by petitioner is correct. We are in accord with the reasoning of the Court of Appeals for the Second Circuit in this regard.[7] Therefore, notwithstanding that hereinafter we hold that petitioner realized long-term capital gain from the sale of the shopping center and not ordinary income, we think that the collapsible corporation provisions are applicable to petitioner.

In a separate argument petitioner attempts to avoid being treated as a collapsible corporation on the basis of the so-called "postconstruction motive" cases. Cf. *Jacobson* v. *Commissioner*, 281 F. 2d 703 (C.A. 3), reversing 32 T.C. 893; *Maxwell Temkin*, 35 T.C. 906; *Charles J. Riley*, 35 T.C. 848, appeal dismissed (C.A. 1). Assuming that its preliminary site-purchasing, zoning, leasing, and mortgage-seeking activities constituted "construction" under the statute, as we have decided above, petitioner argues that the decision to sell the shopping center was not made until after all such activities had been completed and that, therefore, the proscribed "view" did not arise or exist at any time during such "construction." We see no merit in

---

[6] These new provisions are not applicable to the instant case because the terms of the amending statute make them applicable only with respect to taxable years beginning after December 31, 1957, and then only with respect to sales, exchanges, and distributions which occur after the date of enactment, September 2, 1958. Sec. 20(b), Pub. L. 85–866.

[7] Although the point was never specifically discussed, the same factor appears to have been present in many of the prior cases in which a corporation was used to construct apartment buildings, housing developments, or other structures and the stock of the corporation was sold or a corporate distribution was made prior to the realization of a substantial part of the income to be derived from the project. Cf. *Raymond G. Burge*, 28 T.C. 246, affirmed 253 F. 2d 765 (C.A. 4) (apartment building); *Edward Weil*, 28 T.C. 809, affirmed per curiam 252 F. 2d 805 (C.A. 2) (shopping center); *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2), affirming a Memorandum Opinion of this Court (apartment project); *Elizabeth M. August*, 30 T.C. 969, affirmed 267 F. 2d 829 (C.A. 3) (apartment houses); *Leland D. Payne*, 30 T.C. 1044, affirmed 268 F. 2d 617 (C.A. 5) (rental-housing projects); *Max Mintz*, 32 T.C. 723, affirmed 284 F. 2d 554 (C.A. 2) (apartment house project); *C. D. Spangler*, 32 T.C. 782, affirmed 278 F. 2d 665 (C.A. 4), certiorari denied 264 U.S. 825 (rental-housing projects); *Ellsworth J. Sterner*, 32 T.C. 1144 (apartment houses); *Jesse Hartman*, 34 T.C. 1085, affirmed per curiam 296 F. 2d 726 (C.A. 2) (housing projects). The fact that the buildings in these cases may have been capital assets in the hands of the corporations involved and might have been sold by the corporations at a capital gain did not make these corporations any less collapsible under the statute. The important and, indeed, the decisive facts under the statutory definition are that the corporation be availed of principally for construction with a view to a corporate distribution or the sale of its stock prior to the realization by the corporation of a substantial part of the taxable income to be derived from the property and the realization by its shareholders of gain attributable to the property. These facts were present in the cases cited above, and they are equally present here where petitioner's chief asset, a shopping center, was sold pursuant to a plan of liquidation before any income had been realized therefrom.

this attempt to isolate preliminary construction activities from actual physical construction. From its inception the "construction" undertaken by petitioner was not merely the rezoning of the shopping center site and the leasing of the intended buildings but included the actual physical construction of the shopping center and all the land improvements involved therein. Although petitioner agreed on September 21, 1956, to sell its interest in the project prior to the start of physical construction of the shopping center, the sales agreement provided that petitioner was responsible for completing such physical construction and that it would not receive the stipulated consideration for the site until such physical construction had been completed. Petitioner was in fact paid in September 1957, when the construction of the shopping center was completed. Thus, it is clear that petitioner's decision to sell the shopping center and liquidate the corporation was made almost a full year prior to the completion of the construction of the shopping center. In these circumstances, there existed the requisite "view" to a distribution to petitioner's shareholders *before* the completion of construction, and the *Jacobson*, *Temkin*, and *Riley* cases are therefore inapplicable. Sec. 1.341–2(a)(2) and (3), Income Tax Regs.; cf. *Ellsworth J. Sterner*, *supra* at 1148; *Jack Farber*, *supra* at 1155–1158.

For the sake of completeness we should add that for purposes of decision it makes no difference that petitioner's actions in selling the shopping center and liquidating may have been motivated, in whole or in part, by its failure to obtain permanent mortgage financing for the project. Assuming that this was the sole reason for making a distribution to the shareholders, the definition contained in section 341(b) is still applicable to petitioner. Cf. *Ellsworth J. Sterner*, *supra* at 1148.

2. Having decided that petitioner is a collapsible corporation and that the sale of the shopping center is thereby excepted from the non-recognition provisions of section 337 of the 1954 Code, we turn next to the question of the character of the gain realized by petitioner as a result of such sale. The provisions of section 341 relating to collapsible corporations are of no assistance on this question, for they deal only with the treatment of gain to shareholders of collapsible corporations and not with gain realized by the corporation itself. The Commissioner has determined that petitioner's net gain on the sale is taxable to it as ordinary income. Petitioner contends that such gain is properly taxable as long-term capital gain. We agree with petitioner on this issue.

Based on all of the evidence of record, we have made the ultimate finding that at the time petitioner sold the shopping center to the Knights of Columbus petitioner did not hold the shopping center pri-

marily for sale to customers in the ordinary course of its trade or business.[8] Without attempting to recite all of the evidence upon which this finding is based, we do note that petitioner does not appear to have considered sale of the shopping center until April or May of 1956, after it had unsuccessfully attempted to obtain permanent mortgage financing for the project; that the purchase offer from the Knights of Columbus came unsolicited through the offices of Ivor B. Clark, Inc., which had been authorized by petitioner to seek permanent mortgage financing and which therefore required separate authorization from petitioner for the sales negotiations with the Knights of Columbus; that petitioner continued its efforts to seek mortgage financing during the summer of 1956 while it negotiated a possible sale to the Knights of Columbus; and that petitioner's final decision to sell the shopping center was coupled with a decision to liquidate the corporation.

The Commissioner emphasizes two aspects of the record in support of his determination that petitioner's gain constituted ordinary income. First, that some of petitioner's shareholders and, in particular, several members of the Lubin group, were actively engaged in the real estate business during the years 1955 through 1958. We have taken this element of the case into account and have made certain findings in this regard based on stipulated tax returns of the individuals involved. But in the light of the record as a whole, we think the admittedly separate business activities of several of petitioner's individual shareholders have little relevance in the determination of petitioner's purpose in holding the shopping center property at the time of its sale.[9]

The second group of facts underscored by the Commissioner is that at least a portion of petitioner's property, the Korvette store, was offered for sale to a number of third parties before the sale of the entire property to the Knights of Columbus was completed. Our findings show that at about the time the Ivor B. Clark firm presented petitioner with an offer from the Knights of Columbus to purchase the Korvette store only, the Clark firm had a brochure prepared offering petitioner's Korvette building for sale and sent this brochure to a number of institutions, including banks, insurance companies, and one real estate brokerage firm. It is not clear from the record whether

---

[8] Petitioner's purpose in holding the shopping center property at the time of sale is the only matter which the Commissioner put in issue at the trial and on brief. No dispute has arisen over the requisite 6-month holding period for a capital asset. Sec. 1231(b), I.R.C. 1954.

[9] Moreover, since there is evidence that the Lubin group had a prior interest in a shopping center adjoining petitioner's and still holds such interest as an investment, the fact that some members of the Lubin group happen to be real estate brokers and others frequently buy and sell real estate assumes even less significance for our inquiry. Also, it is noteworthy that the Lubin group objected to petitioner's sale of the shopping center and approved the sale only after petitioner's remaining shareholders offered it the greater portion of the resulting gain.

petitioner ever authorized the preparation and general distribution of this brochure or whether the Clark firm, once it had obtained one purchase offer, decided on such action on its own initiative. Since the Clark firm had to obtain special authorization by telegram from petitioner to represent it in sales negotiations for the Korvette store with the Knights of Columbus, the latter would appear to be a distinct possibility. However, even if we could conclude that petitioner authorized the distribution of this particular sales brochure, this fact would not be enough to tip the scales in favor of ordinary income treatment. Taking into account petitioner's original plans to lease the shopping center itself, its extended efforts to get permanent mortgage financing, its continued efforts along these lines even after the purchase offer from the Knights of Columbus had been received and the brochure sent out, and its decision to liquidate once its decision to sell became final, we cannot find that petitioner at any time held the shopping center primarily for sale to customers in the ordinary course of its trade or business.

At the trial and on brief the Commissioner put forward an alternative theory that the price received by petitioner represented funds from a sale plus moneys for services performed, of which at a minimum the latter portion would represent ordinary income in petitioner's hands. The Commissioner points to no evidence of record to show that such was the intent of the parties involved, and we can find none. To be sure, petitioner was not entitled under the sales agreement to any consideration for the shopping center site until it had completed the construction of the shopping center buildings and improvements and had been reimbursed for such construction costs up to a stated maximum amount by the Knights of Columbus. And it may also be assumed that the appreciation in the value of the shopping center site was related to petitioner's past efforts in regard to zoning, hiring architects, obtaining favorable leases, and the like. But there is no indication that either petitioner or the Knights of Columbus intended to segregate any portion or percentage of the agreed consideration of $390,000, stated as payable "for the Shopping Center Site," for petitioner's efforts in developing the shopping center. And we cannot conclude that any such apportionment was in fact the effect of their agreement. Thus, we must also reject the Commissioner's alternative position. We hold that the Commissioner erred in his determination that petitioner's gain on the sale of the shopping center is taxable as ordinary income and not as long-term capital gain.

*Decision will be entered under Rule 50.*